UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FERRIS CLARK SR.,                                              CIVIL ACTION

VERSUS                                                        NO. 12-411

PHI, INC., BELL HELICOPTER TEXTRON              SECTION: C (5)
INC. and ALLIANZ GLOBAL
CORPORATE & SPECIALTY AG

<u>OPINION</u>

Plaintiff Ferris Clark claims damages from defendants PHI, Inc. and Allianz Global and

Specialty AG, (collectively "PHI") and defendant Energy XXI GOM, LLC ("Energy XXI") for

alleged negligence leading to personal injury in a helicopter accident on March 24, 2011.[1] The

Court conducted a bench trial in this matter from October 28, 2013 to October 29, 2013.  Having

considered the testimony and reviewed all of the evidence, the Court finds, for the reasons that

follow, that PHI alone is liable to Plaintiff for the total amount of damages caused by this

accident - $1,324,656.24.

**I. Background**

At the time of this accident, Plaintiff was an employee of Wood Group Production

Services.[2] Wood Group staffs, operates, and maintains oil platforms belonging to Energy XXI.[3]

---

[1] (*See* Rec. Doc. 8 (Amended Complaint).)
[2] (Trial Tr. vol. 1, 185:11-12, Oct. 28, 2013.)
[3] (Trial Tr. vol. 1, 185:18-23; Trial Tr. vol. 2, 408:19-25, Oct. 29, 2013.)

Plaintiff worked as an "A" Operator on one such platform - the Main Pass 68.[4] On March 24, 2011, Plaintiff radioed for transport from Main Pass 68 to a different platform, Main Pass 73A.[5] PHI provides transportation services between Energy XXI's platform.[6] Shortly after Plaintiff radioed, a Bell 206L helicopter owned and operated by PHI and piloted by James Kemper, a PHI employee, picked up Plaintiff with another passenger already aboard the helicopter.[7] In order to refuel, the helicopter landed on a different platform, Main Pass 61A ("MP61A"), owned and operated by Energy XXI.[8]

Before landing on the MP61A, Kemper requested and received a "green deck" from the platform operator, indicating that he had permission to land.[9] After the landing, Kemper remained at the controls with the engine running while Plaintiff refueled the helicopter.[10] This "hot refueling" process lasted approximately 7 minutes, at the conclusion of which Plaintiff reboarded the helicopter and prepared for takeoff.[11]

Winds were light and the helicopter was traveling "light," i.e. below its maximum flight weight.[12] Kemper decided to take off from the MP61A headed northbound, into the prevailing wind and in the general direction of the MP61A's gas compressors and vent boom.[13] He was

---

[4] (Trial Tr. vol. 1, 185:24-186:1.)
[5] (*Id.* at 188:7-12.)
[6] (*See* Trial Tr. vol. 2, 428:9-11.)
[7] (Trial Tr. vol. 1, 188:23-189:9.)
[8] (*Id.*)
[9] (*Id.* at 87:15-25.)
[10] (*Id.* at 88:10-22.)
[11] (*Id.* at 93:18-20, 190:6-12.)
[12] (*Id.* at 71:5-9, 110:5-17.)
[13] (Exs. 9.1, 9.2, & 10.1.)

aware that the flare boom could vent unignited gas and that this gas could cause his engine to malfunction or even cause an explosion.[14] He had been trained to avoid the area downwind or directly above the venting equipment for precisely this reason.[15] Having landed and taken off from MP61A many times, he knew that it did not have a visual warning system to alert him that the platform was venting.[16] Finally, Kemper was aware that he could have taken off in a different direction, such as southbound, away from the prevailing wind, or using a "sidestep" maneuver to hover off of the platform to the west, before taking off northbound into the prevailing wind.[17]

At approximately 4:58 P.M., Kemper brought the helicopter to a 3-foot hover above the helipad.[18] After checking to make sure he had clearance, Kemper brought the helicopter up to a 10 foot hover and then went into forward flight.[19] He was 20 feet from the helipad when he cleared the platform between the compressors and the flare boom.[20]

At that moment, approximately 19 seconds after taking off, Kemper and Plaintiff heard a loud bang and felt the helicopter "yaw" or pull its nose to the left - a motion consistent with loss of engine power.[21] Kemper glanced at his instruments and saw the torque gauge reading high.[22] Believing incorrectly that the helicopter's engine had totally failed, Kemper initiated emergency

---

[14] (Trial Tr. vol.1, 67:23-68:10.)
[15] (*Id.* at 68:19-69:13.)
[16] (*Id.* at 67:14-22, 75:13-17.)
[17] (*Id.* at 71:5-72:13.)
[18] (*Id.* at 82:11-12.)
[19] (*Id.* at 82:20-22.)
[20] (*Id.* at 82:22-23.)
[21] (*Id.* at 55:22-56:3, 159:13-25, 192:1-3, 339:19-340:4.)
[22] (*Id.* at 60:5-9.)

landing procedures, by lowering the collective and cutting off power to the engine.[23] As a result, the helicopter fell roughly 120 feet into the water.[24] The impact caused the bottom of the helicopter and Plaintiff's seat to partially collapse.[25]

After the helicopter had already hit the water, Kemper pulled the collective back up, causing the main rotor to spin under the helicopter's fully functional engine.[26] The helicopter, which had landed slightly unevenly, inverted under the torque of the main rotor.[27] As the helicopter turned over, the rotor blades, each of which weighed half as much as a small automobile, beat against the surface of the water.[28] The beating of the blades reverberated into the cockpit where Plaintiff, the pilot, and the other passenger were still seated.[29] The force was great enough to cause one of the rotor blades to snap off completely.[30]

After taking on water, the engine died, and the rotor blades stopped spinning.[31] As the cockpit filled with water, Plaintiff could not immediately locate his restraint to unfasten it.[32] Plaintiff was "half knocked out;" he blacked out before he was able to free himself.[33] He

---

[23] (*Id.* at 56:2-6, 81:21-82:1.) The collective is a control in the cockpit that increases and decreases the pitch or angle of the rotor blades, causing the helicopter to either rise or fall. (*Id.* at 56:25-57:3.) It simultaneously increases or decreases the fuel supply to the engine. (*Id.* at 116:8-117:1.)

[24] (*Id.* at 130:22-131:1.)

[25] (*Id.* at 122:21-124:13, 285:19-25.)

[26] (*Id.* at 129:4-7, 129:13-16.)

[27] (*Id.* at 129:17-19, 121:10-122:7.)

[28] (*Id.* at 122:2-4, 192:6-8.)

[29] (*Id.*)

[30] (Trial Tr. vol. 2, 529:2-4.)

[31] (*See* Trial. Tr. vol. 1, 192:10-11.)

[32] (*Id.* at 192:12-13.)

[33] (*Id.* at 192:14-17.)

4

eventually made it out of the helicopter and to the surface of the water, although he does not remember how.[34]

After Plaintiff, Kemper, and the other passenger gathered at the surface, a boat took them to platform 73A for medical treatment.[35] Plaintiff immediately noted pain in his upper back and neck.[36] The medical staff placed him in a neck brace.[37] Reliving the accident on the platform, Plaintiff cried openly in public for the first time in his life.[38] From platform 73A, a helicopter transported the accident victims to West Jefferson Hospital where doctors performed a CT scan and an X-Ray on Plaintiff.[39] The hospital discharged Plaintiff approximately two and a half hours after he had arrived, telling him to follow up with his family doctor if necessary.[40]

The next morning, Plaintiff woke up in pain.[41] His neck and back were hurting, and his fingers were numb and burning.[42] During the next few days, he would also experience nightmares, sleeplessness, anxiety, and profound sadness.[43] Four days after the accident, Plaintiff was seen by his family doctor, Dr. Andy Watson, who ordered an MRI and referred Plaintiff to specialists for his various symptoms.[44]

For the sleeplessness and mental health issues, Dr. Watson referred Plaintiff to a

---

[34] (*Id.* at 192:20-193:6.)
[35] (*Id.* at 195:10-15, 227:2-9.)
[36] (*Id.* at 195:10-15.)
[37] (*Id.* at 195:19-24.)
[38] (*Id.* at 195:25-196:3.)
[39] (*Id.* at 227:10-17.)
[40] (*Id.* at 228:7-18.)
[41] (*Id.* at 197:17-19.)
[42] (*Id.* at 197:22-24.)
[43] (*Id.* at 198:1-9.)
[44] (*Id.* at 197:20-25, 199:2-6; Ex. 42.4.)

psychologist, Dr. Anne Henderson.[45] Dr. Henderson referred Plaintiff to a psychiatrist, Dr. Mark

Webb, who was selected by Plaintiff's worker's compensation case manager.[46] Plaintiff has

treated continuously with Dr. Webb and Dr. Henderson since being referred to each.[47] The

doctors have diagnosed Plaintiff with moderate-to-severe depression, severe anxiety, and severe

post-traumatic stress disorder (PTSD) as a result of the helicopter accident.[48] Dr. Henderson has

recommended that Plaintiff treat these symptoms with cognitive behavioral therapy, including

six to twelve sessions of therapy following the trial in this matter.[49] Dr. Webb believes that

Plaintiff will benefit from taking oral psychiatric medication through at least 2016.[50]

Dr. Watson referred Plaintiff to an orthopedist, Dr. Patterson, for his neck and back

pain.[51] Dr. Patterson had recommended an active, exercise-oriented therapy regimen.[52] However,

a month into seeing Dr. Patterson, Plaintiff switched to a different orthopedic specialist

recommended by his worker's compensation case manager, Dr. David Lee.[53] Dr. Lee

recommended conservative treatments, including oral medication, epidural steroid injections,

and physical therapy.[54] This conservative approach only succeeded in relieving Plaintiff's pain

on a temporary basis.[55] Dr. Lee currently recommends that Plaintiff undergo a three-level

---

[45] (*Id.* at 8:3-4.)
[46] (*Id.* at 31:8-15.)
[47] (*Id.* at 198:24-29.)
[48] (*Id.* at 9:21-10:14, 15:1-7, 34:10-35:17, 42:10-12.)
[49] (*Id.* at 10:17-25, 21:10-18.)
[50] (*Id.* at 43:2-13, 53:12-24.)
[51] (*Id.* at 199:2-6; Ex. 42.4.)
[52] (*Id.* at 232:2-7.)
[53] (*Id.* at 201:3-5, 232:8-11.)
[54] (*Id.* at 202:8-15.)
[55] (*Id.*)

cervical discectomy and neck fusion.[56]

At early visits with Dr. Lee, Plaintiff complained of numbness and tingling in his hand, in addition to pain in his neck and back.[57] After conducting a nerve induction test, Dr. Lee referred Plaintiff to one specialist, Dr. Talbot, who operated on Plaintiff's hand.[58] After the surgery, Plaintiff's hand condition became worse, leading Dr. Lee to refer Plaintiff to another specialist, Dr. Stokes, who performed a second surgery on Plaintiff's hand.[59] Since that surgery, Plaintiff has had no trouble with his hand.[60]

Investigation into this accident revealed that the loud bang and temporary loss of power that the helicopter experienced during takeoff were the result of a relatively mild compressor stall.[61] Investigation further showed that the MP61A was venting unignited, compressed gas from its vent boom at roughly the same time as Kemper was taking off from the platform, as a result of an automated shutdown of the platform's number one compressor.[62]

Plaintiff instituted the current action against defendants PHI, Inc., their liability insurer, Allianz Corporate and Global Specialty, Inc., and the helicopter manufacture, Bell Helicopter Textron, Inc. on February 13, 2012.[63] Plaintiff amended his complaint to name the platform's owner, Energy XXI, as a defendant in March 2012.[64] On December 21, 2012, the Court granted

---

[56] (Dr. David Lee Depo. 34:1-10, Nov. 6, 2013.)
[57] (Ex. 42.3; Trial Tr. vol. 1, 201:8-13.)
[58] (*Id.* at 201:14-16.)
[59] (*Id.* at 201:17-20.)
[60] (*Id.* at 202:1-4.)
[61] (*Id.* at 124:14-16.)
[62] (Ex. 64.)
[63] (Rec. Doc. 1.)
[64] (Rec. Doc. 8.)

summary judgment against Plaintiff, on his claims against Bell Helicopter Textron, Inc.[65] Plaintiff's claims of negligence against PHI, Allianz, and Energy XXI were tried before the Court with no jury on October 28 and 29, 2013.

## II. Claims and Defenses

Plaintiff claims against both PHI and Energy XXI under general maritime law for allegedly negligent acts and omissions that caused his neck, back, hand and wrist injuries, as well as his depression, anxiety, and PTSD. He seeks to hold PHI liable for its pilot, Jim Kemper's, negligence in flying toward the MP61A's vent boom, failing to properly diagnose and respond to the helicopter's mid-flight compressor stall, and failing to properly perform an emergency landing.[66]

Plaintiff further seeks damages from Energy XXI's for its allegedly negligent failure to warn Kemper that the platform was venting unignited gas at or near the time of takeoff, either through the platform operators or with an automated visual warning system installed on the platform.[67] Thus, Plaintiff argues that PHI and Energy XXI are jointly and severally liable for the injuries that he sustained in the March 24, 2011 accident and as a foreseeable result thereof.[68]

PHI argues that Energy XXI was the lone proximate cause of Plaintiff's injuries, both because Kemper was not negligent in any act or omission on March 24, 2011 and also because Energy XXI's failure to warn superseded any possible negligence on Kemper's part.[69]

---

[65] (Rec. Doc. 60, 64.)
[66] (Rec. Doc. 149 at 2-7.)
[67] (*Id.* at 7-9.)
[68] (*Id.* at 10.)
[69] (Rec. Doc. 148 at 8-18.)

8

Energy XXI, in turn, argues that Kemper's negligence was the sole proximate cause of the March 24 crash.[70] It argues that it owed no duty to warn Kemper directly that the platform was going to vent because the venting occurred after the helicopter was in flight and headed toward the vent boom.[71] Energy XXI further challenges the existence of any duty to install an automated warning system in light of pervasive industry practice.[72]

In the event that liability is established, both defendants dispute the amount of general damages and medical expenses legally caused by the March 24, 2011 crash.[73]

### III. Jurisdiction

The Court has a duty to examine the basis of its subject matter jurisdiction, even when not prompted to do so by the parties in a particular case.[74] Because the basis of jurisdiction has choice of law implications in the case at bar, the Court hereby renders the following findings regarding subject matter jurisdiction.

In bringing this cause of action, Plaintiff has invoked this Court's admiralty/maritime jurisdiction pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.[75] Maritime jurisdiction over a tort requires "*both* a maritime situs and a connection to traditional maritime activity."[76] Plaintiff's claims have proper maritime situs because the

---

[70] (Rec. Doc. 152 at 33-49.)

[71] (*Id.* at 9-26.)

[72] (*Id.* at 26-33.)

[73] (Rec. Doc. 148 at 18-20; Rec. Doc. 149 at 49-62.)

[74] *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citing 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure s 3522 (1975)).

[75] (Rec. Doc. 1.)

[76] *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 351 (5th Cir. 1999) (emphasis in original) (citations omitted); *accord Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S.

defendants' alleged negligence became operative over navigable waters,[77] (allegedly) causing Plaintiff to sustain injuries when his helicopter crashed into the Gulf.[78] Plaintiff's claims further have a sufficient nexus to traditional maritime activity because PHI's helicopter was engaged in a ferry function traditionally performed by waterborne vessels.[79] The fact that PHI was engaged in a traditional maritime activity extends admiralty jurisdiction to Plaintiff's claims against Energy XXI, even though they were not involved in the ferrying.[80]

## IV. Standards for Analysis

With the exercise of general maritime jurisdiction comes the application of substantive maritime law.[81] Traditional principles of tort are applicable under maritime law.[82] To establish maritime negligence, a plaintiff must demonstrate that there was a duty owed to him by the defendant, a breach of that duty, an injury, and sufficient causal connection between the defendant's conduct and the plaintiff's injury.[83]

Whether a defendant owes a plaintiff a legal duty is a question of law.[84] Existence of duty

---

249, 271 (1972).

[77] (Among other vessels that navigated near the MP61A, there was a jack-up barge which was pictured in a photograph entered into evidence. Ex. 9.1; Trial Tr. vol. 1, 63:1-6.)

[78] *See Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999) ("In determining whether the tort occurred on navigable water, this court looks to where the alleged wrong took effect rather than to the locus of the allegedly tortious conduct.") (citing *Wiedemann & Fransen APLC v. Hollywood Marine, Inc.*, 811 F.2d 864 (5th Cir.1987); *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 288-89 (5th Cir.1989)).

[79] *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1112 (5th Cir. 1982); *Ledoux v. Petroleum Helicopters, Inc.*, 609 F.2d 824, 824 (5th Cir. 1980) (per curiam).

[80] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 541 (1995).

[81] *East River. S.S. Co. v. TransAmerica DeLeval, Inc.*, 476 U.S. 858 (1986).

[82] *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir.1980).

[83] *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

[84] *Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir. 1993).

is measured by the scope of the risk that conduct foreseeably entails and depends on the foreseeability of the harm suffered by the complaining party.[85] A duty may be owed only with respect to an interest that is foreseeably jeopardized by negligent conduct.[86] Foreseeability is determined by reference to what an ordinarily prudent person would expect in the defendant's position.[87]

Negligence is actionable, only if it is the legal cause of an injury to the plaintiff.[88] Legal causation requires something more than a "but for" relationship with the injury; the negligence at issue must be a "substantial factor" in bringing about the injuries complained of.[89] In other words, "some responsibility for the effect must accompany the cause."[90]

## V. Analysis

### A. PHI's Liability

PHI is liable for any damages negligently caused by its pilot in the course and scope of his employment under the doctrine of *respondeat superior*.[91] Plaintiff's claims of Kemper's negligence are three-fold and relate to: (1) his decision to fly toward the MP61A's vent boom, (2) his erroneous diagnosis of engine failure during the flight, and (3) his failure to properly

---

[85] *Canal Barge Co., Inc.*, 220 F.3d at 377.

[86] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010).

[87] *In re Signal Int'l, LLC*, 579 F.3d 478, 492 (5th Cir. 2009).

[88] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 213-214 (quoting *Donaghey v. Ocean Drilling Explor. Co.*, 974 F.2d 646, 649 (5th Cir. 1992)).

[89] *Id.*

[90] *Chisolm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 63 (5th Cir. 1982).

[91] *See Stoot v. D & D Catering Serv., Inc.*, 807 F.2d 1197, 1199 (5th Cir. 1987) ("The recognized principle of agency law that imposes vicarious liability upon employers for the wrongful acts committed by employees while acting in the course of their employment is well ingrained in the general maritime law.").

auto-rotate after diagnosing an engine failure.

*1. PHI is liable for Kemper's decision to fly toward the MP61A's vent boom.*

Both Energy XXI and Plaintiff argue that Kemper behaved negligently in choosing to fly in the general direction of the MP61A's compressors and vent booms on March 24, 2011.[92] They have argued that Kemper's training, PHI's policies, industry recommended practices, and the circumstances presented combined to impose a duty on Kemper to avoid the flight path that he ultimately chose.[93] PHI argues that Kemper appropriately weighed the risks and benefits associated with taking off northbound, given that he did not know and was not warned that gas would definitely be venting at the time of his takeoff.[94]

Under traditional negligence principles applicable to maritime cases, a helicopter pilot owes his passengers a duty to exercise reasonable care in providing for their safety.[95] The pilot must exercise reasonable care to protect his passengers against an unreasonable risk of harm arising out of his services, including the risk of injury from the foreseeable actions of a third party.[96]

The question facing the Court is whether Kemper's flight plan exposed Plaintiff to an unreasonably great risk that the helicopter would ingest unignited gases thereby resulting in

---

[92] (Rec. Doc. 149 at 5-6; Rec. Doc. 152 at 33-36.)

[93] (*Id.*)

[94] (Rec. Doc. 148 at 14-15.)

[95] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 211.

[96] *See In re Dearborn Marine Serv., Inc.*, 499 F.2d at 279 ("actionable negligence may consist of failure to take precautions against foreseeable acts of third persons, and this rule applies though the conduct of the third person is itself negligent.") (citing Restatement (Second) of Torts § 302).

Plaintiff's injury. An unreasonably great risk is one that a reasonable pilot in Kemper's position, and with Kemper's level of training and experience, would have chosen to avoid because it outweighed the utility of the conduct at issue.[97]

Kemper was trained that unignited gas could vent from a platform "at any time," in other words, without warning.[98] Kemper's training referred him to Helicopter Safety Advisory-Recommended Practice (HSAC-RP) 92-4, which further provides that "un-ignited gas vents can release reasonably large volumes of methane gas under certain conditions."[99] These conditions are not enumerated in the advisory, implying that the pilot should always be prepared. PHI's General Operations Manual put Kemper on notice that an entire platform might be unsafe for helicopter operations if it is downwind of the vent boom.[100] Even a lay person would understand that getting closer to the vent boom raises the risk of ingesting harmful gas. Kemper was further trained to plan his takeoff from a fixed platform "to observe and <u>avoid the area downwind of the vent</u>, remaining as far away as practicable from the open end of the vent boom."[101] All of these factors combine to form a general prohibition against flying toward the vent boom at takeoff.

In describing his takeoff route, Kemper testified that he passed directly between the platform compressors and the vent boom, equidistant from both.[102] Doing so would have required the helicopter to come within approximately 22 feet of the open end of the vent boom, which

---

[97] Restatement (Second) of Torts §§ 289, 291.
[98] (Trial Tr. vol. 1, 75:4-6.)
[99] (Exs. 17.1-17.2,53.1, 61.4.)
[100] (Ex. 61.4.)
[101] (Ex. 53.1) (emphasis in original); (*see also* Aeronautical Information Manual (AIM), ch. 10-2-1h2, Ex. 58.6) (stating the same).
[102] (Trial Tr. vol. 1, 83:1-13.)

appears slightly closer than where the helicopter started before takeoff.[103] There is perhaps room to debate whether coming this close to the vent boom was unreasonable, in light of the very general training and instructions that Kemper received regarding the vent boom's dangers. However, based on the evidence presented, the Court finds that Kemper brought the helicopter much closer to the open end of the vent boom than he actually admitted.

 As explained more fully below, a preponderance of the evidence suggests that this accident was caused by gases vented from the MP61A's number one compressor automatically shutting down. Because the capacity of the number one compressor is only 13 cubic feet, it can only vent for five to six seconds, creating a "plume" of limited area that dissipates within one to two seconds.[104] Under these circumstances, Kemper had to have passed within **five feet** of the vent boom for this accident to have happened as the evidence suggests.[105] Without question, Kemper should have known on March 24, 2011, if he did not already,[106] that coming this close to the open end of the vent boom placed his helicopter at extremely high risk of a compressor stall, among other hazards.[107]

 A reasonable pilot would have concluded that this risk outweighed any possible benefit from taking off as Kemper had planned. The only utility gained by Kemper's decision to takeoff

---

[103] (*See* Exs. 9.1, 9.2, & 10.1; Trial Tr. vol. 1, 62:3-65:1; Trial Tr. vol. 2, 533:21-23.)

[104] (Trial Tr. vol. 2, 465:25-469:12; *see also id.* at 446:4-7; Trial Tr. vol. 1, 170:25-171:5.)

[105] (Trial Tr. vol. 2, 469:11-12.)

[106] When Kemper was asked whether he thought he was far enough from the vent boom to be safe, he evaded the question, stating that he was not expecting any gas. (Trial Tr. vol. 1, 84:4-9.) The Court draws a negative inference from this response.

[107] Kemper was also trained not to come within 13 feet of any hard obstacle. (Trial Tr. vol. 2, at 352:3-5.)

northbound was the added engine efficiency of taking off into the prevailing wind.[108] However, he admitted that wind conditions were mild and the helicopter was not carrying a great deal of weight.[109] Under the circumstances, he could have easily taken off using a sidestep maneuver to fly westward off of the platform before flying northward, into the wind to achieve "translational" lift.[110] Such a takeoff would have avoided the hazard that caused the malfunction in this case altogether. While PHI's training indicates that the maneuver should only be used "when environmental conditions/obstructions leave no other course of action,"[111] a reasonable pilot would have regarded unignited gas as an environmental condition worth avoiding.[112] A reasonable pilot in Kemper's position would have taken off using the sidestep maneuver.[113]

This conclusion is bolstered by HSAC-RP 92-4, which cautions pilots to remain "as far away as practicable from the open end of the vent boom" during takeoff.[114] Under this guidance, a pilot should not come any closer to a vent boom unless there is no "practicable" alternative to doing so. In this case, the sidestep maneuver constitutes a practicable alternative. Again, this recommendation is relevant not only as evidence of industry-wide practice, but also because it is expressly incorporated into PHI's training and General Operations Manual.[115]

The facts and circumstances of this case support that Kemper behaved negligently in

---

[108] (Trial Tr. vol. 1, 65:17-22.)

[109] (*Id.* at 71:2-9.)

[110] (*See* Trial Tr. vol. 1, 72:6-13, 153:4-154:2; Trial Tr. vol. 2, 516:4-7.)

[111] (PHI, Inc., Pilot Training Manual, Ex. 62.6.)

[112] (Trial Tr. vol. 2, 515:25-516:15.)

[113] (Tr. vol. 1, 153:4-154:2.)

[114] (Exs. 53.1, Ex. 58.6.)

[115] (Ex. 61.4.); *Canal Barge Co.*, 220 F.3d at 377; *Johnston v. Pool Co. of Texas*, No. 93-4140, 1994 WL 643113 (E.D. La. Nov. 14, 1994).

attempting to takeoff almost directly toward the vent boom.[116] PHI is therefore liable for any

damages legally caused by that decision.

*2. Plaintiff has not shown that Kemper's decision to abort takeoff was negligent. PHI is nonetheless liable for damages caused by that decision.*

Plaintiff and Energy XXI next argue that Kemper negligently misdiagnosed the engine

malfunction that he experienced shortly after takeoff, leading him to overreact and attempt to

land the helicopter.[117] It is undisputed that during the accident, Kemper incorrectly determined

that the helicopter's engine had failed altogether, when in reality it had stalled temporarily.[118]

Although Kemper was familiar with compressor stalls before March 24, 2011, it never occurred

to him that the engine might have stalled.[119] Plaintiff and Energy XXI argue that Kemper

inadequately consulted his gauges and equipment before determining that he had no engine.[120]

Without question Kemper should have known that he was experiencing a compressor

stall.[121] Nevertheless, Plaintiff has not shown that a reasonable pilot who had experienced a

---

[116] (Trial Tr. vol. 1, 83:14-18.)

[117] (Rec. Doc. 149 at 4; Rec. Doc. 152 at 43.)

[118] (Trial Tr. vol. 1, 56:2-4, 58:21-25, 104:2-4.)

[119] (*Id.* at 58:21-59:3.)

[120] (Rec. Doc. 149 at 4; Rec. Doc. 152 at 44, 46.)

[121] A reasonable pilot would have been able to tell the difference between a stall and an engine out in an instant. (*See* Trial Tr. vol. 1, 132:4-8.) As explained by the experts at trial, a compressor stall and an engine out emergency are different animals. A compressor stall is indicated by a pop or bang, with a spike in torque and perhaps oscillations in some other related instrument readings. (*Id.* at 133:8-16; Trial Tr. vol. 2, 335:9-19, 522; Ex. 7.1.) The helicopter experts analogized a stall to the backfiring of a car engine. (Trial Tr. vol. 1, 130:6-15; Trial Tr. vol. 2, 525:2-526:5.) By contrast, an engine out triggers a veritable "Christmas tree" of warning lights. (*Id.* at 522:10-14.) There is a caution "ENG OUT" light and an audible siren. (*Id.* at 519:17-25.) Multiple gauges, including rotor RPM, compressor, power turbine, turbine outlet temperature, and torque would drop instantaneously. (*Id.* at 520:12-522:14.) The rotor RPM drop triggers its own warning light. (*Id.* at 520:12-18.) The engine failure causes an electrical

compressor stall when Kemper did would have chosen to keep flying his aircraft.

Emergency landing is the only proper response to total engine failure.[122] However, it is also the appropriate response to a compressor stall big enough to impact the engine's ability to generate power.[123] A pilot cannot know for certain how big a stall is until he lands and inspects the engine.[124] In the case of any stall, a pilot should ideally reduce engine power and check his gauges to ascertain the magnitude before deciding whether to keep flying.[125]

The problem with this advice from Kemper's perspective is that he may not have had enough time to reduce power and check his gauges before he needed to decide whether or not he needed to abort the takeoff. His stall occurred while the helicopter was in forward flight, with its nose down, traveling at a relatively high rate of speed and low altitude.[126] This combination of altitude and airspeed is commonly referred to as the height/velocity curve, "h/v" curve, or "deadman's" curve because the possibility of emergency landing is already very low.[127] The fact that the nose was down increased the risk that an emergency landing would result in casualty or injury.[128] Taking time to properly diagnose the engine's ability to function might have

---

generator to fail which triggers a third light. (*Id.* at 520:22-521:1.)
   A reasonable pilot could have immediately recognized that Kemper was experiencing a stall from the tell-tale pop and the absence of any significant drop-off in instrument readings. (Ex. 60.69) (listing training in "Simulated Engine Failure" scenarios, "Equipment Examination," and "System Malfunctions").
   [122] (Trial Tr. vol. 1, 118:16-17.)
   [123] (*Id.* at 118:16-17, 135:5-8; Trial Tr. vol. 2, 343:15-18.)
   [124] (*Id.* at 343:17-18.)
   [125] (*Id.* at 524:6-16; Trial Tr. vol. 1, 176:2-7.)
   [126] (*Id.* at 97:1-7161:7-11; Trial Tr. vol. 2, 340:14-25.)
   [127] (*Id.*)
   [128] (*Id.* at 342:16-20; *see also* Trial Tr. vol. 1, 97:10-16 )

compromised Kemper's ability to raise the nose if landing proved necessary.[129] Lowering the collective immediately raised the nose and increased the chances of a safe landing on the skids and fuselage.[130] Those parts of the helicopter are at least designed to give way on impact.[131]

No one suggests that Kemper should have just ignored the stall and kept flying his helicopter.[132] While Plaintiff's expert, Vaughn Ross, testified that Kemper had time to check his gauges before he needed to act, he never reconciled this opinion with the actual time constraints on Kemper's decision-making.[133] Instead, he granted that the altitude was a "big deal" and that Kemper was in a "tough position" all things considered.[134] Meanwhile PHI's expert, Douglas Stimpson, testified that a reasonable pilot would not have had time to check his gauges and would always lower the collective in the case of an engine malfunction to raise the nose and "get the torque out" of the engine, before doing anything else.[135] The Court is ill-equipped to resolve these conflicting perspectives without more information about the timing issues and Kemper's training for this scenario. Under these circumstances, the Court cannot rule out the chance that a reasonable pilot would have chosen to land the helicopter out of an abundance of caution, even if he knew that the helicopter's engine had only stalled.

While this conclusion is fatal to a finding of Kemper's fault for his decision to land, it does not excuse PHI from any liability for damages caused by the landing. PHI is vicariously

---

[129] (Trial Tr. vol. 2, 341:21-342:8.)
[130] (*Id.* at 342:16-20; *see also* Trial Tr. vol. 1, 117:8-9.)
[131] (Trial Tr. vol. 2, 285:19-25.)
[132] (Trial Tr. vol. 1, 176:2-7.)
[133] (*Id.* at 132:4-8.)
[134] (*Id.* at 163:4-164:2.)
[135] (Trial Tr. vol. 2, 345:7-346:9.)

liable for the sum total of damage within the scope of, and legally caused by, Kemper's negligent decision to fly toward the vent boom. A reasonable pilot would have foreseen that flying toward the vent boom might necessitate a risky emergency landing, such as this one. As explained below, the fact that Energy XXI vented gas without providing Kemper a direct warning does not break this chain of causation. PHI is therefore liable for any injury resulting from this hastily executed emergency landing.

*3. Kemper's failure to properly "autorotate" was negligent.*

Finally, both Plaintiff and Energy XXI have argued that Kemper's execution of emergency landing procedures fell below the standard of care expected of commercial helicopter pilots because he failed to "roll" the throttle to flight idle during the maneuver.[136]

The emergency landing that Kemper attempted in this case is called "autorotation."[137] It is a maneuver whereby the pilot shuts down the helicopter's engine and attempts to land without it. The helicopter's descent forces air through the main rotor causing it to spin under the force of gravity.[138] As discussed, the ability to safely autorotate is compromised if the pilot begins in the H/V curve.[139]

There are five steps to a proper autorotation. First, the pilot lowers the collective to eliminate rotor pitch and power to the engine.[140] Next, the pilot turns the engine all the way off

---

[136] (Rec. Doc. 149 at 2-4; Rec. Doc. 152 at 44-45.)
[137] (Trial Tr. vol. 1, 56:5-6.)
[138] (*Id.* at 117:13-19.)
[139] (Trial Tr. vol. 2, 347:8-19.)
[140] (*Id.* at 117:8-10.)

19

by "rolling" the throttle to flight idle.[141] Toward the bottom of the descent, the pilot "flares" the helicopter to further decrease the rate of descent and forward movement.[142] Finally, he raises the collective to allow any residual torque from the engine to cushion the landing.[143]

If a pilot fails to roll the throttle, the main rotor will spin at full engine power when the pilot raises the collective.[144] The resulting torque can lead to loss of directional control.[145] It can further lead the helicopter to invert or flip over, which actually happened in this case.[146] The helicopter's flight manual and Kemper's training called for him to roll the throttle each time he attempted to autorotate, without exception.[147]

Kemper has maintained that rolling the throttle to flight idle was not an absolute requirement.[148] Even PHI has not attempted to defend this view.[149] PHI argues instead that this failure was not a legal cause of Plaintiff's injuries because the helicopter would have inverted even without the rotor torque.[150] The Court does not accept this argument, as it was contradicted by several witnesses.[151] Furthermore, the question is not whether the helicopter would have

---

[141] (*Id.* at 117:9-10; Trial Tr. vol. 2, 529:8-12.)

[142] (Trial Tr. vol. 1, 117:20-24; Trial Tr. vol. 2, 528:2-3.) The meaning of "flare" was not explained during trial.

[143] (Trial Tr. vol. 1, 118:3-4; Trial Tr. vol. 2, 528:3-4.)

[144] (*Id.* at 346:14-19.)

[145] (*Id.*)

[146] (Trial Tr. vol. 1, 118:23-119:3; *see also* Trial Tr. vol. 2, 357:24-358:2.)

[147] (Trial Tr. vol. 1, 119:21-23; Trial Tr. vol. 2, 356:23-25, 529:8-17; *see also* Ex. 60 (training logs).)

[148] (Trial Tr. vol. 1, 57:16-19, 178:15-19.)

[149] (Rec. Doc. 148 at 14.)

[150] (Rec. Doc. 148 at 14; *see* Trial Tr. vol. 2, 281:21-282:2.)

[151] This argument was directly contradicted by multiple witnesses. (*See* Trial Tr. vol. 1 121; Trial Tr. vol. 2, 346-47, 358, 528-29.)

inverted eventually under the natural current of the Gulf. The question is whether the rotor torque caused the helicopter to flip over violently, contributing to Plaintiff's injuries in this case.

Finally, PHI's expert, Douglas Stimpson, attempted to defend Kemper by arguing that no pilot, himself included, would have had time to roll the throttle to flight idle under the circumstances present on March 24, 2011.[152] However, this opinion was contradicted by the circumstances. Kemper had 10 seconds of descent within which to act.[153] Moreover, the throttle that Kemper was supposed to "roll" is located on the collective that he had to manipulate to begin autorotation in the first place.[154] A reasonable pilot in his position would have been able to operate it during that time.

Kemper was unquestionably negligent for failing to roll the throttle in this case. PHI is therefore vicariously liable for damages incurred as a result of his failure to do so.

B. Energy XXI's Liability

Plaintiff claims that Energy XXI was negligent for failing to warn Kemper, either directly or through an automated warning system, that its platform was venting unignited, compressed gas when the helicopter took off.

The parties have not identified, and the Court has been unable to locate, a body of case

---

[152] (*Id.* at 357:19-23.) Plaintiff argues that this testimony is irrelevant because Kemper would have made the wrong choice no matter how much time he had. (Rec. Doc. 149 at 3.) While the inability of a reasonable pilot to roll the throttle in the time allotted does not serve to defeat Kemper's negligence in failing to even attempt to roll the throttle, it fatally undermines causation, in that Kemper would not have had time to roll the throttle, even if he had not unreasonably ruled out the possibility of a stall.

[153] (Trial Tr. vol. 1, 160:20-23; Ex. 8.7.)

[154] (Trial Tr. vol. 1, 116:9-10.)

law dealing specifically with the duties of a platform owner to its business invitees under general maritime law.[155] PHI has suggested that Energy XXI's liability should be analyzed under Louisiana law because state law serves to fill any gaps in general maritime law.[156] However, the Court need not look to state law to analyze a platform owner's duties to its business invitees; a much simpler analogy exists under controlling precedent.

The Fifth Circuit has treated a slip owner like the owner of a vessel for purposes of determining the nature and scope of the slip owner's duty to warn.[157] Because a platform owner is a landowner for purposes of the general maritime law, like the slip owner,[158] it follows that the platform owner's duties would be governed by the same principles. Under this analogy, the owner of a fixed platform owes a duty of ordinary care to its business invitees, which includes a duty to warn of harm that is reasonably foreseeable.[159] "The circumstances of the danger and the

---

[155] The reasons for this gap in the extant case law are simple. The Outer Continental Shelf Lands Act (OCSLA) "defines the body of law applicable" to fixed platforms in the outer continental shelf and commands the application of the laws of the adjacent state to claims filed under its auspices. *Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 365-66 (1969). Although OCSLA does not displace general maritime law where both could apply, it often governs platform-related tort claims because there is no maritime jurisdiction over injuries that occur on a platform. *Hufnagle v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350, 351-52 (5th Cir. 1999). Notwithstanding *Jerome B. Grubart*, *supra* platforms present an infrequent opportunity for the application of maritime law. *Cf. id.*

[156] (Rec. Doc. 148 at 8.)

[157] *See Casaceli v. Martech Intern., Inc.*, 774 F.2d 1322, 1331 (5th Cir. 1985) (citing *Daigle v. Point Landing, Inc.*, 6161 F.2d 825, 827 (5th Cir. 1980)).

[158] *See, e.g.*, *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218-19 (1986).

[159] *Casaceli*, 774 F.2d at 1328-29; *accord Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) ("It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew."); *see also Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 335 (5th Cir. 1993) (wharfowner owes any business invitee on his property the duty to exercise reasonable care in all the circumstances).

defendant's knowledge of the risk determine the required degree of care."[160]

*1. Energy XXI had no opportunity to warn Kemper directly that gas was venting*.

As previously stated, this accident was caused by gas that vented when the MP61A's number one compressor automatically shut down at approximately 5 P.M. Platform personnel have consistently maintained that this compressor shutdown was the source of the gas ingested by Kemper's helicopter since the initial investigation.[161]  The only evidence suggesting otherwise is the MP61A's flare and venting report, which indicates that another 132,000 cubic feet of compressed gas was vented from the platform at some point on March 24, 2011 for "[t]esting, [u]nloading, [and] [c]leaning" purposes.[162] Platform personnel have disavowed knowledge of any such venting at the time that Kemper's helicopter was operating on the platform.[163] While they may be partial to Energy XXI's interests, it is equally probable that they are telling the truth and this venting happened at a different time, when neither they nor PHI's helicopter were present.

The MP61A has a horn to alert platform operators when platform equipment like the number one compressor automatically shuts down.[164]  The main purpose of the horn is to prompt the operator to service the equipment and bring it back on line.[165] Plaintiff and PHI argue that the platform operators on board the MP61A negligently failed to warn Kemper that the platform was venting unignited gas just before it caused the compressor stall that led him to attempt an

---

[160] *Casaceli*, 774 F.2d at 1329 (citations omitted).
[161] (Trial Tr. vol. 2, 388-390.)
[162] (Ex. 14.1.)
[163] (Trial Tr. vol. 2, 409:7-18, 418:13-18, 427:25-428:5, 449:16-21.)
[164] (*Id.* at 380:6-381:1.)
[165] (*Id.* at 381:10-22.)

emergency landing.[166] Energy XXI argues that its employees could not have breached a duty to warn Kemper because the venting occurred while the helicopter was already airborne, moments before it passed by the vent boom.[167] The parties dispute whether this shutdown occurred well enough in advance of Kemper's takeoff to impose a duty on Energy XXI to warn him or make breach of that duty a causal factor in Plaintiff's injuries.

As an initial matter, notwithstanding the timing issue, any duty to warn a pilot directly would depend on an operator's knowledge, actual or constructive, that the pilot was attempting to takeoff during the limited window in which the gas posed a threat.[168] As explained below, that window was only seconds long. Here, the platform operators neither knew nor had reason to know that Kemper would be departing during that window. They could not see the helicopter from the master control center.[169] While apparently, they could hear it, there is no indication the sound of the helicopter told them what it was doing from moment to moment. Kemper never turned off the helicopter because it was "hot fueling."[170] Kemper's only "green deck" request came before he landed on the platform, some 7 minutes before he took off.[171] Finally, the platform operators were not air traffic controllers, and PHI's pilots did not treat them as such.[172] When the alarm sounded to indicate the compressor shut down, no one expected their first

---

[166] (Rec. Doc. 148 at 8; Rec. Doc. 149 at 7-8.)
[167] (Rec. Doc. 152 at 8.)
[168] *Cf. Daigle*, 161 F.2d at 828 (finding no duty to warn where ship's master could not see the plaintiff because master had neither knew nor had reason to suspect that his maneuvering endangered the plaintiff).
[169] (Trial Tr. vol. 2, 419:19-420:4.)
[170] (Trial Tr. vol. 1, 88:10-22.)
[171] (*Id.* at 93:18-20.)
[172] (*See id.* at 169:8-15.)

reaction to be determining what Kemper's helicopter was doing; they had a duty to respond to the compressor shutdown.[173] On these facts, the Court finds no duty for the platform operators to warn Kemper.

Furthermore, Plaintiff has not proven that this alleged failure to warn even contributed to this accident. The accident happened approximately 7 seconds after the helicopter went into forward flight from its 10-foot hover.[174] To avoid this accident, Kemper would have needed to receive a direct warning before he committed to taking off into the prevailing wind. One expert testified that from the moment an operator is alerted to a compressor shutdown, it takes, at most, 7 seconds for gas to vent and dissipate into the atmosphere.[175] This means that the platform operators heard an alarm either at the same time as Kemper was entering forward flight or shortly thereafter. This would not have allowed them to issue a warning to Kemper over the radio. Although some of the evidence contradicted this time estimate,[176] it does not persuade the Court that the operators' collective omission is causally related to this accident.

*2. Energy XXI had no duty to install an automated warning system to warn Kemper that gas was venting.*

Plaintiff and PHI have also argued that Energy XXI was negligent for failing to install a lighted warning system to warn pilots of imminent venting in the event of automated compressor

---

[173] (Trial Tr. vol. 2, 381:10-22.)

[174] (*Id.* at 511:18-21.)

[175] Mr. Smith testified that it would take the compressor 5.5 seconds to vent its contents leaving a plume capable of causing a stall for approximately 1 to 2 seconds. (*Id.* at 467:21-25, 495:6-16.)

[176] The operators testified from memory that they remembered seeing the helicopter go down approximately 20 seconds after they heard the alarm. (*Id.* at 423:23-25.)

25

shutdowns.[177] However, Plaintiff fails to establish that Energy XXI owed a duty for his safety to install such a system.

The evidence presented belies any notion that warning systems of this kind have been adopted industry-wide. None of the witnesses, in their near-century of combined experience working on oil platforms had ever seen such a warning system installed.[178] Nor has Plaintiff pointed to any industry guidelines recommending their installation.[179] The aviation guidance that Plaintiff has provided only cautions platform owners to install and, pilots to be on the lookout for, a visual warning in the case of "large scale" or "high volume" venting.[180] The 13 cubic feet of gas released automatically by the MP61A's number one compressor does not qualify as "large scale" or "high volume."[181]

More to the point, Energy XXI only owed a duty to install a rotating red beacon or some other form of visual warning system insofar as it was foreseeable that a pilot would ignore his training and deliberately fly toward the vent boom.[182] A premises owner is under no general obligation to warn his invitees of risks about which they are equally knowledgeable.[183] Kemper was well acquainted with the risk that unignited gas could automatically vent leading to the situation that he experienced on March 24, 2011. He was further adequately trained to avoid that

---

[177] (Rec. Doc. 148 at 11; Rec. Doc. 149 at 8-9.)
[178] (Trial Tr. vol 2, 427:12-15, 449:10-15, 471:19-472:1.)
[179] (*Id.* at 472:2-7.)
[180] (Exs. 53.1, 58.7.)
[181] (Trial Tr. vol. 2, 446:4-7, 469:3-6.)
[182] *Daigle*, 6161 F.2d at 827.
[183] *See, e.g., Hite v. Maritime Overseas Corp.*, 380 F. Supp. 222, 226 & n.9 (E.D. Tex. 1974) (collecting cases); *see also* Restatement (Second) of Torts § 343A.

risk. Energy XXI had no reason to expect he would ignore his training.

Finally, given that it takes a pilot as much or more time to make it from the helipad to the vent boom as it does for the platform to vent gas after the alarm sounds, a visual warning system would not help pilots on the MP61A avoid danger. On the contrary, as Energy XXI has argued, it would lull pilots into a false sense of security regarding approaching the vent boom, thereby increasing the danger to careless pilots like Kemper. The current policy of forbidding pilots to fly anywhere near the vent boom is clearly preferable and apparently sufficient to prevent accidents, if properly followed.

In light of the foregoing, Energy XXI is not liable to Plaintiff for the commission of any maritime tort. As PHI is the only party liable to Plaintiff for negligence, the Court need not address PHI's claims of superseding negligence vis-a-vis Energy XXI.

D. Damages

Having determined that liability issues in this case, the Court must determine whether there is a causal nexus between PHI's negligence and the various injuries noted in Plaintiff's complaint. Plaintiff seeks to recover for past and future mental, cervical, and hand/wrist pain and suffering, medical expenses, and lost wages and income.[184] PHI disputes all aspects of the damages claimed.[185]

1. Psychological Damages

Plaintiff has shown by a preponderance of the evidence that he has suffered and will

---

[184] (Rec. Doc. 149 at 10-26.)
[185] (Rec. Doc. 148 at 19.)

suffer mental pain and suffering as a result of this accident. He began suffering nightmares, anxiety, and sleeplessness immediately after.[186] He experiences flashbacks of the accident, vivid nightmares, phobias, memory issues, panic attacks, and crying episodes.[187] He is terrified of the sensation of water above his neck level, which causes him to avoid showers.[188] He can still hear the sound of the rotor blades beating against the water, from when he was trapped in the cockpit.[189] Plaintiff experiences triggers that remind him of the accident on a near daily basis.[190] Needless to say, Plaintiff had none of these symptoms before the accident.[191]

Drs. Henderson and Webb have diagnosed Plaintiff with severe anxiety, mild-to-severe depression, and severe post-traumatic stress disorder.[192] Both doctors linked the onset of these conditions to Plaintiff's accident on March 24, 2011.[193] The lingering impact of these conditions on Plaintiff's life has been at once wide-ranging and acute. Plaintiff has lost interest in the activities of life and withdrawn from society.[194] He has nightmares of home invasion so vivid that he sleeps with a shotgun in his hand.[195] One night he almost shot a friend trying to enter his home.[196] He is afraid to operate a motor vehicle in any amount of traffic.[197] Plaintiff's

---

[186] (Trial Tr. vol. 1, 198:1-9, 203:8-204:14.)
[187] (*Id.* at 42:13-16, 195:25-196:5, 203:8-204:14.)
[188] (*Id.* at 204:21-25.)
[189] (*Id.* at 204:18-20.)
[190] (*Id.* at 12:10-12, 38:11-39:4.)
[191] (*See generally id.* at 193-207.)
[192] (*Id.* at 9:21-10:16, 15:1-7, 34:10-35:17, 42:10-12.)
[193] (*Id.* at 19:19-22, 45:20-46:2.)
[194] (*Id.* at 15:10-14, 35:1-6, 42:13-16..)
[195] (*Id.* at 207:2-5.)
[196] (*Id.* at 207:8-13.)
[197] (*Id.* at 206:9-14.)

sleeplessness and interpersonal trust deficits contributed to his break-up with his girlfriend.[198] These symptoms will never fully subside.[199]

The Court is satisfied there is a causal link between Plaintiff's psychological condition and this accident. Further, regardless of how others might have reacted to this accident, or have in fact reacted to it, it is clear that Plaintiff was severely traumatized.

The parties have stipulated to an amount for past medical expenses that incorporates his past treatments for this condition.[200] Regarding future treatment, Plaintiff will likely experience the effects of PTSD for the rest of his life.[201] However, he will most likely reach maximum psychiatric improvement from his relationship with Dr. Webb in March 2016, five years from the date of this accident.[202] Dr. Henderson anticipates that Plaintiff will need at most twelve more sessions following trial.[203] Plaintiff has stipulated to the cost of future treatment calculated by PHI's vocational expert, which is not itemized in terms of mental health expenditures.[204]

Under the circumstances, the Court will award $400,000 total in general damages for these psychological injuries, with $350,000 allocated toward past mental pain and suffering and $50,000 allocated toward future mental pain and suffering. While Plaintiff will continue to suffer under the weight of this accident, he appears to have made significant strides through his treatment with Drs. Webb and Henderson. The Court makes this observation both based on the

---

[198] (*Id.* at 205:17-206:1.)
[199] (*Id.* at 53:18-21.)
[200] (Ex. 40.1.)
[201] (*Id.* at 53:18-21.)
[202] (*Id.* at 42:2-13.)
[203] (*Id.* at 21:10-20, 28:19-29:10.)
[204] (Ex. 77 at 5.)

doctors' testimony and Plaintiff's demeanor and composure as he recounted this incident at trial.

## 2. Physical Damages: Cervical Spine

Plaintiff has further proven injury to his cervical spine as a result of this accident. He told medical staff on board Energy XXI's platform about his neck pain immediately after the accident and received a neck brace.[205] The morning after, he "felt like he had been in a fight."[206] His neck and back hurt and he had pain and numbness radiating into his fingers.[207] The Monday following the accident, Plaintiff had an appointment with his family doctor, Dr. John Watson, wherein he noted these symptoms.[208] According to his treating orthopedist, Plaintiff was in "a lot of pain" when he first sought treatment and has maintained some complaints of pain throughout his treatment.[209] Epidural steroid injections have only succeeded in relieving this pain on a temporary basis.[210] Physical therapy has similarly proven ineffective.[211] According to the only evidence presented, Plaintiff has no previous history of these symptoms.[212]

## a. Causation of Injury

Dr. Lee attributes these symptoms to herniation at the C3-4 disc, partial collapsing of the C4-5 and C5-6 discs, and a likely strain of Plaintiff's back muscles as he tried to wiggle out of his helicopter restraint.[213] Dr. Lee testified that the partial collapsing at C5-6 had resulted in

---

[205] (Trial Tr. vol. 1, 195:10-24.)
[206] (*Id.* at 197:17-19.)
[207] (*Id.* at 197:21-198:2.)
[208] (Ex. 42.)
[209] (Lee Dep. 23:16-24:6, 55:15-20.)
[210] (Trial. Tr. vol. 1, 202:8-203:1.)
[211] (*Id.* at 202:16-19.)
[212] (Lee Dep. 50:12-22, 78:2-79:1.)
[213] (Lee Dep. 10:25-11:16, 15:6-16, 47:15-48:4, 50:12-51:15, 55:15-18.)

nerve root impingement or compression, while the protrusion at C3-4 was pushing the spinal fluid away from his spinal cord.[214] According to Dr. Lee, the helicopter accident on March 24, 2011 more likely than not caused the herniation at C3-4.[215] While Dr. Lee described the collapsing at C4-5 and C5-6 as "arthritic," "degenerative," and pre-existing, he opined that the fall in the helicopter had aggravated the condition.[216]

PHI disputes Dr. Lee's opinion that the helicopter accident caused or even contributed to any condition observed in Plaintiff's cervical spine, relying on the testimony of its biomechanical engineer and physician, Dr. Robert Banks.[217] Dr. Banks opined that Plaintiff's injuries could not have been caused by the incident given the forces applied during the fall and the absence of traumatic injury to Plaintiff's lower or lumbar spine.[218]

The Court was not impressed with Dr. Banks's testimony. His previous study of autorotations is not relevant given the flawed nature of the autorotation at issue in this case.[219] The helicopter came down much harder than it was supposed to.[220] Dr. Banks had no reliable, scientific basis for his estimate of the forces applied during the landing.[221] As the Court indicated at trial, Dr. Banks's opinion that Plaintiff could not have injured his cervical spine at all without "disrupting" or fracturing a vertebrae in his lumbar spine was "junk science."[222] He had never

---

[214] (*Id.* at 20:7-21:1.)
[215] (*Id.* at 66:24-67:4.)
[216] (*Id.*)
[217] (Rec. Doc. 148 at 19.)
[218] (*Id.* at 310:21-311:3, 316:25-317:3.)
[219] (*Id.* at 293:24-294:2.)
[220] (*Id.* at 346:3-9.)
[221] (*Id.* at 318:5-319:3.)
[222] (*Id.* at 296:6-7.)

actually tested the impact of "vertical loading" on the cervical spine.[223] He was extrapolating generously from basic laws of physics.[224]

Although Plaintiff fell from his porch fracturing his ankle a month after this accident, the evidence does not support that this contributed to Plaintiff's pain or injury.[225] Plaintiff's complaints of neck pain have been consistent and followed immediately after this accident.[226] The Court further accepts Dr. Lee's opinion that the rib fractures observed on Plaintiff's X-rays predate this accident and were visible in his West Jefferson Hospital X-ray.[227] Plaintiff did not fracture his ribs falling from his front porch. Based on this evidence, the Court finds that the helicopter accident legally caused Plaintiff's cervical injuries and pain.

Considering the facts of this case, the Court will award general damages in the amount of $200,000, with $175,000 allocated toward past damages and $25,000 allocated toward future damages. Plaintiff has described his neck pain as more of an ache than a shooting pain.[228] While it is still bad enough to impact his quality of life, it is no longer as bad as in the immediate aftermath of the accident.[229] Additional treatment should remedy any residual pain.

b. Treatment/Expenses

In the event that causation is satisfied, the parties have stipulated to an amount of past

---

[223] (*Id.* at 325:20-22.)
[224] (*Id.* at 295:22-296:1.)
[225] (Trial Tr. vol. 1, 200:2-25.)
[226] (*See, e.g.*, *id.* at 195:10-24; Ex. 42.)
[227] (Lee Dep. 56:18-57:8.)
[228] (Ex. 42.1.)
[229] (*See* Lee Dep. 69:6-11, 71:3-11.)

medical expenses that incorporates Plaintiff's cervical spine medication and treatments.[230] Regarding future expenses, there is great dispute.

Based on Plaintiff's age, the nature of his condition, and his professed inability to find relief from therapy, exercise, and epidural injections, Dr. Lee recommends that Plaintiff undergo three-level discectomy at C3-4, C4-5 and C5-6 and neck fusion surgery.[231] PHI contests the necessity of this procedure to alleviate Plaintiff's pain. It cites Dr. Nutik's observation that Plaintiff's descriptions of pain are general and his inability to detect nerve root compression.[232] However, Dr. Lee testified that herniation and disc collapsing could cause pain without nerve root compression.[233] Further, he did detect nerve root compression at C5-6 that he believed was contributing to Plaintiff's pain.[234] The surgery was primarily intended to alleviate that pain.[235]

Moreover, Dr. Lee's surgery recommendation was only partially related to pain relief and nerve root decompression. It was also based on the need to relieve pressure from the anterior surface of the spinal cord at C3-4.[236] He expressed concern that if Plaintiff's herniation at C3-4 were to worsen at all, it could lead to serious health problems like chronic pneumonia, partial paralysis, and bladder incontinence.[237] Dr. Nutik did not grapple with this part of Dr. Lee's opinion. Accordingly, the Court finds the surgery recommended by Dr. Lee to be both necessary

---

[230] (*See* Ex. 40.)
[231] (*Id.* at 34:3-20, 35:4-17, 67:22-68:1.)
[232] (Trial Tr. vol. 1, 260:4-61:14.)
[233] (Lee Dep. 49:4-24.)
[234] (Lee Dep. 20:7-21:1, 61:18-62:9.)
[235] (*Id.* at 68:18-24.)
[236] (Lee Dep. 68:6-13.)
[237] (*See id.* at 20:11-21:1, 22:15-23:3.)

and causally related to the accident in this case.[238] The Court will award the $55,000 estimated by Dr. Lee to be necessary for surgery, along with any associated expenses conveyed to PHI's vocational expert.[239]

### 3. Physical Damages: Carpal Tunnel

Plaintiff has shown injuries to his hand and wrist as a result of this accident. Days after the accident, Plaintiff felt numbness in his right hand.[240] At his early visits with Dr. Lee, he noted these symptoms.[241] After conducting a nerve induction test, Dr. Lee diagnosed Plaintiff with carpal tunnel syndrome and referred him to a specialist, Dr. Paul Talbot.[242] In October 2011, Dr. Talbot performed carpal tunnel decompression surgery on Plaintiff.[243]

After the surgery, Plaintiff's hand became worse; Plaintiff could not zip his pants, button his collar, or text on his mobile phone.[244] This led Dr. Lee to refer Plaintiff to another specialist, Dr. Harold Stokes.[245] In his evaluation, Dr. Stokes noted "atrophic changes" in Plaintiff's right hand, meaning that Plaintiff was losing muscle in his hand in a process that might have become irreversible.[246] This led Dr. Stokes to diagnose severe carpal tunnel syndrome and perform a second surgery on April 2, 2012.[247] This second surgery has succeeded in reversing the atrophic

---

[238] (*See id.* 47:21-48:4) ("I think the helicopter crash is why he's going to have the surgery.").

[239] (*See* Lee Dep. 39:2-14; Ex. 77.)

[240] (Ex. 42.3.)

[241] (Trial Tr. 201:8-13; Lee Dep. 9:16-20.)

[242] (*Id.* at 201:8-16; *see also* Lee Dep. 28:14-20.)

[243] (Ex. 33; Dr. Harold Stokes Dep. 10, Oct. 21, 2013.)

[244] (Trial Tr. vol. 1, 201:17-19.)

[245] (*Id.* at 201:20-25.)

[246] (Stokes Dep. 11:16-12:22, 13:1-3.)

[247] (*Id.* at 12:23-25, 17:16-21.)

changes in Plaintiff's hand. Since the surgery, Plaintiff has had no trouble with the hand.[248]

Dr. Stokes has testified that trauma, such as the impact of the helicopter accident on March 24, 2011, can result in carpal tunnel syndrome.[249] He believes that Plaintiff's carpal tunnel syndrome was more likely than not caused by the March 24th accident.[250] Plaintiff testified that he never had hand and wrist issues before this incident.[251] Against this backdrop, the Court finds that Plaintiff has established causation.

As with Plaintiff's other injuries, the parties have stipulated to the amount of past medical bills incurred as a result of carpal tunnel syndrome.[252] No future medical expenses are anticipated.[253] The Court will award an additional $15,000 in general damages to compensate Plaintiff for the inconvenience of temporary losing the use of his right hand and the stress of not knowing whether that loss was permanent.

4. Economic Damages

Finally, Plaintiff has proven economic injury as a result of this accident. At the time of his accident, Plaintiff was an A Operator with Wood Group, earning $73,165 per year after taxes and unreimbursed business expenses.[254]

As a result of this accident, Plaintiff will be psychologically unable to return to offshore

---

[248] (Trial Tr. vol. 1, 202:3-4, 231:10-14; Stokes Dep. 19:8-20.)
[249] (*Id.* at 19:21-23.)
[250] (*Id.* at 19:24-20:4.)
[251] (*Id.* at 184:2-5.)
[252] (*See* Ex. 40. )
[253] (*See* Stokes Dep. 19:12-16) (describing discharge of Plaintiff from care).
[254] (Ex. 78 at 7); *see Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983) ("a fact-finder should subtract amounts the wage earner would have been required to pay, such as income tax and work expenses" from a calculation of lost income).

work for the rest of his life.[255] Plaintiff was temporarily unable to work anywhere as a result of

his post-traumatic stress disorder.[256] Dr. Webb cleared Plaintiff to return to non-offshore work in

August of 2013.[257] Immediately after the accident, Plaintiff's family doctor concluded that he

was physically unable to work.[258] As of trial in this matter, Plaintiff had not been released by his

treating orthopedist to return to work.[259] In light of these findings, the Court accepts Dr. J. Stuart

Wood's calculation of Plaintiff's past lost earnings and will award Plaintiff damages in the

amount of $131,935.22.[260]

Dr. Lee believes that Plaintiff will reach maximum medical recovery 90 days after his

surgery.[261] At that time, he will release Plaintiff to return to work.[262] Dr. Webb noted that there

may be some side-effects to Plaintiff's psychiatric medication which prevent him from holding

certain kinds of jobs in the near future.[263] Nevertheless, and notwithstanding Plaintiff's own

opinions about his ability to return to work,[264] the Court finds that Plaintiff will be both

psychologically and physically capable of obtaining gainful employment 90 days after his

surgery is completed. Whether he chooses to do so is his decision.

When Plaintiff does return to work, he will, more likely than not, be making minimum

---

[255] (Trial Tr. vol. 1, 19:25-20:22.)
[256] (*Id.* at 35:18-23.)
[257] (*Id.* at 45:1-11.)
[258] (Ex. 42.4.)
[259] (Lee Dep. 41:6-12.)
[260] (Ex. 78 at 8.)
[261] (*Id.* at 41:22-42:1.)
[262] (*Id.* at 42:12-22.)
[263] (*Id.* at 43:16-25.)
[264] (Trial Tr. vol. 1, 208:18-19.)

wage. As Mr. Meunier noted in his report, the higher paying work that Plaintiff could do given his skills and education is mostly farming, repair, maintenance, construction, and installation work.[265] Plaintiff will be permanently restricted from stooping, climbing ladders, and bending even after he has his surgery, which will likely prevent him from working in those fields.[266] Plaintiff's chances of earning above minimum wage are therefore unfavorable.

Neither of the economic experts has offered an estimate of Plaintiff's lost future earnings in light of his inability to return to work until 90 days after his back surgery.[267] However, it is Plaintiff's burden to prove the amount by which his lost wages exceed Dr. Wood's estimates, which are based on Plaintiff returning to work on January 1, 2014. In the absence of such proof, the Court will adopt Dr. Wood's estimate and award $450,916.90 in lost future earnings.[268]

## VI. Conclusion

PHI is solely liable for the psychological, physical, and economic injuries that Plaintiff sustained on March 24, 2011. Those injuries included depression, anxiety, post-traumatic stress disorder, cervical spine injury and aggravation of pre-existing degenerative condition, medical expenses, and finally lost wages and earning potential. As such, Plaintiff is entitled to recover $1,324,656.24 from PHI, as explained above and specifically itemized below. Judgment shall enter accordingly.

---

[265]  (Ex. 71 at 4-5; *see also* Ex. 77 at 7-8.) This is not to say that there are no higher paying jobs that Plaintiff could do. However, given the rarity of these jobs, it appears more likely than not that Plaintiff will actually have an entry level job paying at or near the minimum wage.

[266]  (Lee Dep. 44:9-45:17.)

[267]  (*See* Exs. 72, 78.)

[268]  (Ex. 78 at 13.)

| General Damages | |
|---|---|
| A. Past Mental Pain and Suffering: | $350,000.00 |
| B. Future Mental Pain and Suffering: | $50,000.00 |
| C. Past Physical Pain and Suffering (Neck, hand, and wrist): | $190,000.00 |
| D. Future Physical Pain and Suffering (Neck): | $25,000.00 |
| Medical Expenses | |
| E. Past Medical Expenses: | $50,113.48 |
| F. Future Medical Expenses: | $76,690.64 |
| Economic Damages | |
| G. Past Lost Earnings: | $131,935.22 |
| H. Future Lost Earnings: | $450,916.90 |
| TOTAL: | $1,324,656.24 |

New Orleans, Louisiana, this 16th day of July, 2014.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE